# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A LIGHT BLUE LG STYLO 6 CELL PHONE WITH IMEI 354952920471293 SEIZED 325 NORTH STREET, SACO, MAINE CURRENTLY LOCATED AT THE PORTLAND POLICE DEPARTMENT | No. 2:25-mj-00128-KFW |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Ryan Hatch, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Detective with the Saco Police Department in Saco, Maine and a graduate of the Maine Criminal Justice Academy. I have been a Detective for the past 10 years and during that time I was assigned as a Special Agent with the Maine Drug Enforcement Agency from March of 2015 to April 2019. I am currently assigned as a general Detective investigating serious felony crimes to include violent crimes and serious property crimes as well as other violations of Maine Criminal Law.

2. As of October 2022, I was assigned as a Task Force Officer ("TFO") for the Federal Bureau of Investigation Safe Streets Task Force / Southern Maine Gang Task Force. The task force focuses on drug trafficking, gum crimes, and other violence involving organized crime. I have also applied for search warrants and/or assisted in the execution of search warrants involving forensic extractions of digital evidence.

3. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search a light blue LG Stylo 6 cell phone with International Mobile Equipment Identity (IMEI) 354952920471293 (the "Target Device") seized by the Saco Police Department on about March 30, 2024,

while executing a judicially authorized search warrant at 325 North Street, Saco, Maine. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, other agents, and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) (Distribution or Possession with Intent to Distribute Controlled Substances), and 846 (Attempt and Conspiracy) have been committed by Target Subject PATRICK MCKINNON ("MCKINNON") and others. There is also probable cause to search the Target Device described in Attachment A for evidence and instrumentalities of these crime as described in Attachment B.

## PROBABLE CAUSE

5. I hereby adopt and incorporate by reference the affidavit filed in support of a search warrant in the United States District Court, District of Maine Case No. 2:24-mj-122-KFW, attached hereto as Exhibit C. Exhibit C authorized a ping on the Target Cell Phone with assigned call number (207) 205-7690. Exhibit C incorporates Exhibit B, a previous search warrant affidavit filed in the United States District Court, District of Maine Case No. 2:24-mj-102-KFW. That warrant authorized the search of two Apple iPhones and one TCL cell phone seized from JUSTIN NEVES' girlfriend's apartment in Old Orchard Beach, Maine. Exhibit B incorporates Exhibit A, a previous search warrant affidavit filed in the United States District Court, District of Maine Case No. 2:24-mj-67-KFW, which authorized the search of three Apple iPhones, two were recovered from a Honda HR-V and one from JOSHUA ESTRADA a/k/a "Mac" ("ESTRADA"). Exhibit A

incorporates Exhibit 1, a previous search warrant affidavit filed in the United States District Court, District of Maine Case No. 2:24-mj-54-KFW, which outlines the identification of ESTRADA, YANCARLOS ABRANTE a/k/a "Glizzy" ("ABRANTE"), and JASON JOHNSON-RIVERA a/k/a "Ouda" ("JOHNSON-RIVERA") as subjects of an investigation.

6. During the 30-day authorization period for the Target Cell Phone (Exhibit C), T-Mobile did not provide any location data for the Target Cell Phone. T-Mobile was contacted and the service provider indicated the device was likely powered off.

7. On about May 14, 2024, MCKINNON was arrested on two unrelated outstanding warrants out of the State of Maine. I conducted an in-custody interview with MCKINNON at the Saco Police Department. MCKINNON waived his rights and consented to the interview.

8. MCKINNON was asked what he knew about the individuals involved in the February 9, 2024, shooting that occurred in Saco, Maine. MCKINNON said all he knew was what he saw on the news. MCKINNON said that the involved individuals, known to him only by their nicknames, "Mac," "Glizzy," and "Ouda" do not talk to him anymore. MCKINNON had only met "Ouda" three days before the shooting. MCKINNON did not want to discuss how he met them but said it was, "through drug stuff." MCKINNON's drug of choice at the time he met Mac, Glizzy and Ouda was crack (meaning cocaine base) and dope (meaning heroin or fentanyl). MCKINNON said the three supplied more crack than dope. MCKINNON could not count how many times he had purchased drugs from them but confirmed it was more than a couple of times. MCKINNON typically purchased between one-half gram and "balls" of crack cocaine at

a time and paid $80 per gram. I know a "ball" to be one-eighth ounce or 3.5 grams in weight.

9. During the time of the shooting, MCKINNON used approximately one gram of fentanyl and as much crack cocaine as he could afford. MCKINNON said he was sometimes a "middleman" so he never had his own source of supply for drugs.

10. MCKINNON was shown a video that was extracted from JOHNSON-RIVERA's cell phone (Target Device 1 from Exhibit A) from a forensic examination that depicted MCKINNON handling two firearms and holding a metal spoon of what appeared to be a controlled substance. MCKINNON denied ownership of the firearms in the video. When asked who the firearms belonged to, MCKINNON said, "Well if they weren't mine, they must be theirs" referring to Mac, Glizzy, and Ouda. MCKINNON described the firearms as a little revolver and the other one was a 9mm or something like that. MCKINNON had never seen the firearms fired so could not say if they were real or not and did not see any ammunition with them. MCKINNON explained "they literally started the video and handed them to me." MCKINNON said there was cocaine in the spoon but not much of it. MCKINNON believed Mac, Glizzy, and Ouda were in the room when the video was recorded.

11. MCKINNON was asked if he ever saw Mac, Glizzy or Ouda use or threaten violence. MCKINNON said Mac held a gun to his head at a hotel one time. MCKINNON said someone took Mac's "shit" and he assumed that he (MCKINNON) knew something about it. MCKINNON said this happened at the hotel behind Dunkin Donuts in Biddeford (Holiday Inn Express). MCKINNON stated that this happened within a two-week span of the video and the shooting.

4

12. MCKINNON last communicated with Mac by text message a week or so after the Saco shooting. MCKINNON said he does not currently have a cell phone, and his most recent telephone number was (207) 205-7690. MCKINNON said his last phone was an LG and was seized by police at 325 North Street, Saco, Maine.

13. I queried the evidence seized from 325 North Street, Saco, Maine, and identified a blue LG cell phone (S/N: 011VTWP0022129, IMEI: 354952920471293) with a black case and charger which had been located on the floor near the bed in one of the upstairs bedrooms.

14. T-Mobile Records on the Target Cell Phone (Exhibit C) identified the IMEI number for the device (207) 205-7690 to be 354952920471290. An IMEI is broken down into three sections, the Type Allocation Code (TAC), the Serial Number (SN), and the Check Digit (D) or the Software Version Number (EE). The TAC is the first eight digits of the IMEI, the SN is the next six digits, and the last digit or digits is/are the D or EE. According to Official Document TS.06 version 21 published on February 21, 2022, by the GSM Association, the check digit shall always be transmitted to the network as "0". Therefore, because the first 14 digits of the IMEI match between the Target Device and the IMEI number provided in the T-Mobile records, I believe the Target Device was assigned call number 207-205-7690.

15. The Target Device was transferred to the FBI on about June 6, 2024, and has remained in their custody. A photograph of the Target Device appears below:



Target Device

16. As documented in Exhibit C and paragraph 12 of this affidavit, MCKINNON utilized his cell phone to communicate with known drug distributors. I know from this and previous investigations that individuals use cell phones to communicate with their drug suppliers and drug clients. As such, there is probable cause to believe that MCKINNON committed the offense of possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1), and attempt and conspiracy in violation of 21 U.S.C. § 846. There is probable cause to search the Target Device described and shown in Attachment A for evidence of these crimes as described in Attachment B.

**TECHNICAL TERMS**

17. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate

7

reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A

GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

18. Based on my training, experience, and research, I believe that the Target Device has capabilities that allow it to serve as wireless telephone, digital camera,

portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, websites and other content that have been viewed via the Internet are typically stored for some period of time on the accessing device. This information can sometimes be recovered with forensics tools.

20. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able

       to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

22. *Manner of execution*. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

23. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Device described and shown in Attachment A to seek items described in Attachment B.

Respectfully submitted,

Ryan Hatch
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Apr 10 2025

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title