# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (207) 205-7690, WITH INTERNATIONAL MOBILE SUBSRIBER IDENTITY 310240230183577 | No. 2:24-mj-122-KFW |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Jonathan Duquette, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (207) 205-7690, with International Mobile Subscriber Identity 310240230183577, with no listed subscriber (the "Target Cell Phone"), whose service provider is T-Mobile US, Inc. ("T-Mobile"), a wireless telephone service with offices at 4 Sylvan Way, Parsippany, New Jersey. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. See 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. See 18 U.S.C. § 3123(b)(1).

3.      I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). I have been in this position since June 2015, and I have been a Task Force Officer in FBI's Boston Division since January 2018. I am also a Border Patrol Agent with the U.S. Border Patrol and have been in this position since December 2009. In my career, I have utilized various investigative tools and techniques, to include the use of search warrants involving cellular data.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) (Distribution or Possession with Intent to Distribute Controlled Substances), 846 (Attempt and Conspiracy), and 18 U.S.C. § 922(g)(3) (Unlawful user of a Controlled Substance in Possession of a Firearm) have been committed, are being committed, and will be committed by Target Subject PATRICK MCKINNON, and his associates. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

6.      The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

7.      For reference, a previous search warrant affidavit has been filed in the United States District Court, District of Maine Case No. 2:24-mj-102-KFW and is attached as Exhibit B. That warrant authorized the search of two Apple iPhones and one TCL cellphone seized from JUSTIN NEVES' girlfriend's apartment in Old Orchard Beach, Maine. Exhibit B incorporates Exhibit A, a previous search warrant affidavit filed in the United States District Court, District of Maine Case No. 2:24-mj-67-KFW, which authorized the search of three Apple iPhones, two were recovered from a Honda HR-V and one from JOSHUA ESTRADA ("ESTRADA"). Exhibit A incorporates Exhibit 1, a previous search warrant affidavit filed in the United States District Court, District of Maine Case No. 2:24-mj-54-KFW, which outlines the identification of ESTRADA, YANCARLOS ABRANTE ("ABRANTE"), and JASON JOHNSON-RIVERA ("JOHNSON-RIVERA") as subjects of an investigation.

8.      Target Device 1 from Exhibit A was determined to be utilized by JOHNSON-RIVERA (with assigned call number 508-863-7847). Target Device 2 from Exhibit A was determined to be utilized by ABRANTE (with assigned call number 508-972-3282). While reviewing Target Device 1, I located a video that had been uploaded to Snapchat on February 1, 2024, from Snapchat account Jayouda_912, which belonged to JOHNSON-RIVERA[1]. The video captured a Caucasian male wearing jeans, a white tee shirt, black puffy jacket and red hat. The video showed the man holding a spoon that

---

[1] Subscriber records obtained from Snapchat on user, Jayouda_912, identified the verified phone number for the account was 508-863-7847, a known number for JOHNSON-RIVERA.

appeared to contain a controlled substance in one hand and a handgun in the other.  A second handgun was in the man's waistband.  A screen shot of the video is shown below:



9.      I showed the video to Saco Detective and FBI Task Force Officer Ryan Hatch who believed the man captured in the video holding the spoon was MCKINNON.

10.      Target Device A from Exhibit B was determined to be utilized by JUSTIN NEVES a/k/a "Savage" and was assigned call number 774-636-0214 (0214). While reviewing Target Device A, I located a Facebook Messenger conversation between Facebook user "Patrick McKinnon" (Unique ID 100000811666870) and Facebook user "Bos Sav" (Unique ID 100055865648492). Facebook user "Bos Sav" was identified as the "owner" in Target Device A.

11.      On March 17, 2024, at 5:35:23 PM (UTC), Patrick McKinnon sent the following message to Bos Sav:

4

> From: 100000811666870 Patrick McKinnon
>
> Tressy just fucked my whole spot up for work. I should've never involved bringing him here to make money. Now my motion is all fucked up and I have no work at all and people calling and shit. I have the customers no problem just need work on deck. Whether I work my way up from a basket or partner up with someone. This has everything fucked up cuZ I don't even have anyone else to get work from like I need . I need either someone to chill here or at least work with me  a little bit while shit gets rolling again. Our regular guy is gone and we're loosing money fast
>
> 3/17/2024 5:35:23 PM(UTC+0)
>
> Source Extraction:
> Legacy

12.     I know from my training and experience that the term "work" is likely a reference to drug sales. Based on MCKINNON's statement that, "Our regular guy is gone and we're loosing [sic] money fast" leads me to believe NEVES and MCKINNON were somehow connected in drug sales.

13.     On March 17, 2024, at 10:53:41 PM (UTC), Patrick McKinnon sent the following message to Bos Sav:

> From: 100000811666870 Patrick McKinnon
>
> Lost $1300 myself today out of just my plays. Was only able to take care of a couple people cuz there was no work to sell unless people wanted to drive me around let me run with money. I brought in $6500 in one night and usually never under $1-3k a night.  But my busiest times are from 10-5am
>
> 3/17/2024 10:53:41 PM(UTC+0)
>
> Source Extraction:
> Legacy

14.     In the above message, MCKINNON's references to "work" and "sell" again lead me to believe he is referring to drug sales. McKinnon claimed he made $6500 in one night with average sales between $1000 to $3000 per night with his busiest times between 10 (pm) and 5 am.

15. While reviewing text messages in Target Device A, I located a text message conversation between 0214 and 207-205-7690 (7690). A contact was not saved for 7690. The text message conversation between 0214 and 7690 occurred between February 10, 2024 and March 17, 2024. On March 24, 2024, at 11:45:20 PM (UTC) 7690 sent 0214 the following message:



16. The above text message is the exact same message that MCKINNON sent to NEVES (Bos Sav) on Facebook Messenger approximately 52 minutes earlier. This leads me to believe 7690 was being utilized by MCKINNON. The following text messages were found on Target Device A between 7690 (McKinnon) and 0214 (NEVES):





From: +17746360214 _$!<Other>!$_ (owner)
To: +12072057690

No?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +12072057690 | | | |

Status: Sent

2/11/2024 9:52:14 PM(UTC+0)

Source Extraction:
Legacy

---

From: +12072057690
To: +17746360214 _$!<Other>!$_ (owner)

I'm calling him now and making him figure something out because there's no excuse that it's not taken care of

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +17746360214 _$!<Other>!$_ | | 2/11/2024 9:53:13 PM(UTC+0) | |

Status: Read

2/11/2024 9:53:07 PM(UTC+0)

Source Extraction:
Legacy

---



From: +17746360214 _$!<Other>!$_ (owner)
To: +12072057690

Say less

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +12072057690 | | | |

Status: Sent

2/11/2024 9:53:20 PM(UTC+0)

Source Extraction:
Legacy

---

From: +12072057690
To: +17746360214 _$!<Other>!$_ (owner)

I really need that other g bro whether I have to come get it or whatever but most of the bread wasn't mine and I had to pay dude out of my pocket

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +17746360214 _$!<Other>!$_ | | 2/13/2024 3:28:35 PM(UTC+0) | |

Status: Read

2/12/2024 9:49:49 PM(UTC+0)

Source Extraction:
Legacy





17.    The above text messages further bolster my belief that MCKINNON and NEVES were involved in drug sales together and it appears as thought NEVES was supplying MCKINNON with drugs during this timeframe. I am familiar with several of MCKINNON's code words which have another meaning. The word "bread" referenes money and a "ball" is a specific quantintiy of drugs equal to one-eighth of an ounce or 3.5 grams. Both of those terms ("bread" and "ball") are common code words.

18.    Utilizing a law enforcement website I determined the service provider for 7690 was T-Mobile. Subscriber records obtained from T-Mobile did not identify the subscriber leading me to believe the service is pre-paid (i.e. TracFone). Call detail records (CDR) showed 7690 had a total of 85 contacts with NEVES (774-636-0214) between January 21, 2024 and March 22, 2024. CDRs showed 7690 had a total of 165 contacts with ESTRADA (207-730-2993) between January 9, 2024 and March 26, 2024.

CDRs showed 7690 had a total of 233 contacts with ABRANTE (508-972-3282) between January 10, 2024 and February 8, 2024. Of the contacts listed above, ABRANTE was in MCKINNON's top five contacts.

19.     A criminal history query for MCKINNON identified him as a wanted person. A limited extradition warrant was entered on February 21, 2024, for Failure to Appear – Aggravated Trafficking of Scheduled Drugs Class A, by the Sanford (Maine) Police Department.

20.     MCKINNON does not have a known residence and is known to stay with different people for short times before moving to another location.

**ADDITIONAL INFORMATION REGARDING WIRELESS CARRIERS**

21.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitudelongitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest

to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

22.    Based on my training and experience, I know that T-Mobile can collect cellsite data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. This information can be extremely useful when attempting to locate a suspect or identify his or her past historical location. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes. By analyzing the incoming and outgoing phone numbers along with the duration, date, and time of who the subject (Target Cell Phone) is communicating with through the cellular service provider's records can assist law enforcement in identifying the other party to the call. By running those telephone numbers through normal investigative steps and searches through open-source public databases, this can lead to the identification of specific locations such as a hotel, residence, or other type of physical address. When used in conjunction with cell-site and other precision location information can lead to identifying and confirming specific addresses or areas of interest where the subject is or has been. This information is also necessary and part of the service provider's call detail records (ordinary business records) associated with historical cell-site information and is necessary to gain a more

10

complete understanding and more accurate view of a subject's historical and perspective location.

23.    Based on my training and experience, I know that cellular providers such as T-Mobile can also collect Timing Advance data, which is also referred to as Per Call Measurement Data ("PCMD"), the "real-time tool" ("RTT"), and True Call data. Timing Advance data estimates the approximate distance of the cellular device from a cellular tower based upon the time it takes for signals to travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

24.    Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), an International Mobile Equipment Identity ("IMEI"), a Subscription Permanent Identifier ("SUPI"), and/or a Network Access Identifier ("NAI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content. Also, once the subject has been taken into custody, this identifying account information (to include email addresses and subscriber information) may also be necessary for evidentiary purposes to identify the cellular records with the subject's phone itself on a particular date and

time. Furthermore, other identifying information such as subscriber information, email addresses associated with the user of the account, all assist law enforcement identify and confirming the end user (subject) to the account maintained by the service provider. This information may also help identify if the subject discontinues service, changes devices (such as IMEI, ESN, MEID, or SUPI), or if someone else begins using this telephone number after the subject terminates the account or provides the phone to another user.

25. Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users.

## AUTHORIZATION REQUEST

### TECHNICAL TERMS

26. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

27. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant

to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

28.    I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

29.    I further request that the Court authorize execution of the warrant at any time day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

Respectfully submitted,

_____

Jonathan Duquette
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date: Apr 19 2024

City and state: Portland, Maine

_____
Judge's signature

Karen Frink Wolf,  U.S. Magistrate Judge
Printed name and title

14

## **ATTACHMENT A**

### **Property to Be Searched**

1.      The cellular telephone assigned call number (207) 205-7690, with International Mobile Subscriber Identity 310240230183577, with no listed subscriber (the "Target Cell Phone"), whose service provider is T-Mobile US, Inc. ("T-Mobile"), a wireless telephone service with offices at 4 Sylvan Way, Parsippany, New Jersey.

2.      Records and information associated with the Target Cell Phone that is within the possession, custody, or control of T-Mobile including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

### I.    Information to be Disclosed by the Provider

All information about the location of the Target Cell Phone described in Attachment A for a period of 30 days, during all times day or night. "Information about the location of the target telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A. It further includes:

- Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, MIN, SUPI, and MAC address(es);

- Source and destination telephone numbers;

- Date, time, and duration of communication; and

- All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the mobile device associated with the Target Cell Phone will connect at the beginning and end of each communication, as well as Timing Advance data (also known as PCMD, RTT, LOCDBOR, True Call, Quantum, or similar records).

It also includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C § 3123 by the service provider and the Federal Bureau of Investigation. The pen register/trap and trace device shall be

transferable to any change dialed number (MSISDN) subsequently assigned to a device bearing the same ESN, IMSI, SUPI, or SIM as the target cell phone; any changed ESN, IMSI, SUPI, or SIM subsequently assigned the same dialed number as the target cell phone; or any additional changed dialed number, ESN, IMSI, SUPI, or SIM listed to the same subscriber account as the target cell phone.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facility, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the target telephone on T-Mobile's network or with such other reference points as may be reasonably available and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II.    Government Procedures for Warrant Execution

The United States government will conduct a search of the information produced by T-Mobile and determine which information is within the scope of the information to be seized specified in Section I. That information that is within the scope of Section I may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER

that does not fall within the scope of Section I and will not further review the

information absent an order of the Court. Such sealed information may include

retaining a digital copy of all information received pursuant to the warrant to be used for

authentication at trial, as needed.